Filed 8/5/25  Andes Harvest v. Oceanus Décor & Flooring CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ANDES HARVEST, INC., | B338967 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 23PSCV01816) |
| v. | |
| OCEANUS DÉCOR & FLOORING, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Salvatore Sirna, Judge.  Affirmed.

Liu & Wakabayashi and Youjun Liu for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

———————————

Respondents Oceanus Décor and Flooring, Inc. (Oceanus) and Zhigang Cui subleased a commercial property to plaintiff and appellant Andes Harvest, Inc. (Andes). After the parties signed the lease, Andes discovered that, at some point, burglars had stripped and damaged the property's electrical and power systems. Oceanus refused to return Andes's security deposit and initial rent payment. Andes sued Oceanus and Cui for breach of contract and related claims. Andes also obtained a right to attach order and a writ of attachment against Oceanus. Oceanus successfully moved to set aside the right to attach order and to quash the writ.

On appeal, Andes contends the trial court erred in finding it failed to establish the probable validity of its breach of contract claim. We conclude substantial evidence supported the trial court's order and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

CUPS (DE) LP leased commercial real property in the City of Industry, California (the property or the premises) to Waddington North America, Inc., a predecessor of Novolex Holdings, LLC. CUPS (DE) LP and Waddington North America, Inc. signed the "Master Lease." Novolex Holdings, LLC later subleased the property to Oceanus.

In February 2023, Andes's representative toured the property and observed a functioning electrical system. In March 2023, Andes confirmed that the property's electrical system was in "good working condition." That same month, Oceanus signed a statement that "Owner has no actual knowledge that the . . . electrical and lighting systems . . . on the Property as of the date hereof, if any, are not in good operating order and condition . . . ."

On May 3, 2023, Andes and Oceanus entered into "Sublease 2," relating to the property. Oceanus did not provide Andes the key or permission to take possession of the property on that day or on May 15, the date Sublease 2 commenced.

Sublease 2 stated that "Sublessor 2/Sublessee has obtained consent from the Owner and Sublessor/Lessee under the Master Lease to sublet the Subleased Premises . . . as noted on Exhibit C, attached hereto and incorporated by reference . . . ." On May 24, CUPS (DE) LP, Novolex, Oceanus, and Andes signed the "Consent to Sublease 2."

On May 26, Oceanus's real estate agent e-mailed the executed consent and Sublease 2 to Andes's real estate agent, writing: "I have also attached the payment instructions for rent [and] security deposit. Once that is completed, Oceanus will hand over the keys." On May 30, Andes made the required payment and e-mailed Oceanus's agent to request the key. Oceanus kept the key in a coded lock box on the premises. In the proceedings below, Oceanus's agent declared that he provided Andes or its real estate agent the code "well before and at least on 05/31/2023."

On May 31, Andes's real estate agent picked up the key at the property and entered the premises. He found the building "vandalized" and the "power was stripped." The electrical panels, circuits, and wires were missing, and there was no electrical power on the premises. He informed Oceanus's agent. Oceanus's agent responded that this was "unfortunate" news and said Oceanus would file a police report.

On June 1, Andes requested a refund of its payment of the June rent and security deposit. On June 6, Oceanus informed Andes it would not refund the security deposit, but it was in the

process of recovering the rent from its landlord. Oceanus requested "more time to resolve this," and said it was "meeting with electricians to find the faste[st] way to solve the electrical issues."

On June 20, Andes sued Oceanus and its owner, Cui, for breach of contract, breach of the implied covenant of good faith and fair dealing, concealment, conversion, restitution, and breach of the duty of disclosure.[1] Andes alleged that the electrical and power systems were missing before it accepted the key to the premises. Andes contended that with "no electrical system," the premises failed to satisfy the required conditions of Sublease 2.

Andes applied for a right to attach order and writ of attachment against Oceanus. The trial court found Andes failed to allege how Oceanus breached Sublease 2 and denied the application without prejudice. Andes applied again. This time, it attached the Master Lease, which it explained included *all* "fixtures," and specifically electrical and power systems. Sublease 2 is subject to and subordinate to the terms and conditions of the Master Lease, and Sublease 2 incorporates the Master Lease by reference. The trial court granted Andes's application.[2] The court concluded Andes established the probable validity of its claims by sufficiently showing that Oceanus breached the lease when it delivered the premises to Andes without the electrical and power systems.

---

[1] Although Andes also sued other entities, this appeal concerns only Oceanus and Cui.

[2] We grant Andes's unopposed January 6, 2025 motion to augment the record with two documents: the trial court's November 28, 2023 tentative ruling and its minute order adopting that ruling.

4

In January 2024, Oceanus filed a cross-complaint.  Oceanus alleged that under the Master Lease, Andes was still required to pay rent despite any "partial destruction" of the premises. Oceanus claimed $2.88 million in lost rent.

Oceanus also filed a motion to set aside the right to attach order and quash the writ.  Oceanus argued it delivered the property to Andes with functioning electrical and power systems, and all damage was due to third-party theft.  Oceanus also asserted that Sublease 2 and the Master Lease did not permit Andes to terminate the lease, thus Andes's failure to pay rent constituted a breach of contract.  Oceanus further contended that its counterclaim for unpaid rent completely offset any amounts it owed Andes.  Oceanus asserted Andes had not met the statutory requirement to show that the amount to be secured by the attachment was greater than zero.

In a supporting declaration, Ryan Tsui, a former Oceanus employee, attested that he made sure the electrical and power systems were in working condition "on or about April 14, 2023," and "squarely before" Sublease 2 was signed.  Tsui also declared that during lease negotiations, the key to the property was always available to Andes for "inspection."  Tsui learned of the burglary on June 1.

Allen Yan, Oceanus's office manager, submitted a declaration regarding the damage, with photos.  He described the electrical system as "savaged," and submitted 12 photos depicting various components of the system.

In opposition to the set aside motion, Andes argued Oceanus did not deliver the premises when the parties signed Sublease 2 on May 3.  Andes pointed out that the "Consent to Sublease 2" was signed on May 24.  On May 26, Oceanus's

leasing agent required payment from Andes before Oceanus turned over the key to the property. Andes made the payment on May 30, its agent discovered the burglary when he picked up the key on May 31, and Andes requested a refund the very next day. Andes argued it was therefore permitted to abandon the tenancy due to non-delivery of the electrical and power systems and asserted it never accepted delivery of the premises.

In May 2024, the trial court granted Oceanus's motion to set aside the right to attach order and to quash the writ of attachment. The court reasoned Andes did not allege that Oceanus failed to deliver possession of the property, and Andes simply asserted that it never accepted delivery. Andes's claim failed as Oceanus and Cui "will likely be able to establish they were not responsible for the damage to the City of Industry property's electrical system," so Andes's claim lacked probable validity. The trial court also concluded it was "more probable" that Andes was the party that had breached the agreement by failing to pay rent; therefore, there was a showing that Andes's claims lacked probable validity.

Andes filed a timely notice of appeal.

## DISCUSSION

### I. Applicable Legal Principles and Standard of Review

Code of Civil Procedure section 481.010 et seq., sets forth the procedures and requirements for obtaining a prejudgment writ of attachment.[3] "Provisional relief in the form of an attachment is available for money claims based on breach of contract." (*Pech v. Morgan* (2021) 61 Cal.App.5th 841, 854, fn. omitted (*Pech*); § 483.010, subd. (a).)

---

[3] All subsequent undesignated statutory references are to the Code of Civil Procedure.

6

To order a writ of attachment, a court must find: (1) "[t]he claim upon which the attachment is based is one upon which an attachment may be issued"; (2) "[t]he plaintiff has established the probable validity of the claim upon which the attachment is based"; (3) "[t]he attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based"; and (4) "[t]he amount to be secured by the attachment is greater than zero." (§ 484.090, subd. (a)(1)–(4).)

"A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." (§ 481.190.) "This definition requires the plaintiff to 'at least establish a prima facie case.' [Citation.]" (*Pech*, *supra*, 61 Cal.App.5th at pp. 854–855.)

Under section 485.240, subdivision (a), "Any defendant whose property has been attached pursuant to a writ issued under this chapter may apply for an order (1) that the right to attach order be set aside, the writ of attachment quashed, and any property levied upon pursuant to the writ be released . . . ." Then, "[a]t the hearing on the motion . . . [i]f the court finds that the plaintiff is not entitled to the right to attach order, it shall order the right to attach order set aside, the writ of attachment quashed, and any property levied on pursuant to the writ released." (*Id.*, subd. (c).) The trial court's determination "shall be made upon the basis of the pleadings and other papers in the record; but, upon good cause shown, the court may receive and consider at the hearing additional evidence, oral or documentary, and additional points and authorities . . . ." (*Id.*, subd. (d).)

Although in a motion to set aside a writ of attachment under section 485.240 the defendant is the moving party, the plaintiff still retains the burden of proving the probable validity

7

of that claim under section 484.090. (*Loeb & Loeb v. Beverly Glen Music, Inc.* (1985) 166 Cal.App.3d 1110, 1116.)

"A trial court's factual findings in an attachment proceeding, including its probable validity finding, are subject to our substantial evidence standard of review." (*Pech*, *supra*, 61 Cal.App.5th at p. 855; *Santa Clara Waste Water Co. v. Allied World National Assurance Co.* (2017) 18 Cal.App.5th 881, 885.) We review the evidence in favor of the prevailing party, and resolve conflicts and draw reasonable inferences in support of the judgment. (*Pech*, at p. 855.)

## II. Substantial Evidence Supports the Trial Court's Finding that Andes Has Not Established the Probable Validity of Its Breach of Contract Cause of Action

Andes argues Oceanus failed to deliver the premises with any electrical and power systems, in breach of the Master Lease as incorporated into Sublease 2. Andes also asserts it refused to accept partial delivery of the premises, and was permitted to do so under the Master Lease's quiet enjoyment clause, and thus was not the breaching party for failing to pay rent. We reject these arguments and conclude substantial evidence supports the trial court's determination that Andes did not establish the probable validity of its breach of contract cause of action.

### A. Oceanus's alleged breach of contract

Under well-established principles of law governing commercial leases, "[i]n the absence of an express covenant or stipulation binding him so to do, the landlord is under no obligation to put the demised premises in any particular condition." (*Davis v. Stewart* (1944) 67 Cal.App.2d 415, 418;

8

accord, *Strecker v. Barnard* (1952) 109 Cal.App.2d 149, 152; see also 10 Miller & Starr, Cal. Real Estate (4th ed. 2024) § 34:56.)

"The principles of contract interpretation apply equally to leases as to any other kind of contract." (*Castaic Studios, LLC v. Wonderland Studios LLC* (2023) 97 Cal.App.5th 209, 214.) " ' "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) When possible, the parties' mutual intention is to be determined solely from the language of the lease. "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' . . . controls judicial interpretation." [Citation.]' [Citation.]" (*Eucasia Schools Worldwide, Inc. v. DW August Co.* (2013) 218 Cal.App.4th 176, 181; see also Civ. Code, § 1644 ["[t]he words of a contract are to be understood in their ordinary and popular sense"].)

The Master Lease provides that the demised premises include electrical and power fixtures. It also states that the landlord leases and the tenant takes the premises "as is," and the landlord does not make "any warranty or representation" regarding "condition." The relevant part of the Master Lease entitled "Title and Condition" states in full:

> "(b) Tenant acknowledges that the Leased Premises are in acceptable condition and repair at the inception of this Lease. LANDLORD LEASES AND WILL LEASE AND TENANT TAKES AND WILL TAKE THE LEASED PREMISES <u>AS IS</u>. TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) HAS NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD BE

9

DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE LEASED PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO (i) ITS FITNESS, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE . . . ."

Nothing in the Master Lease guaranteed that Oceanus would deliver the electrical and power systems in any particular condition.

Sublease 2 states: "[s]ublessor/[l]essee hereby warrants that it has satisfied all obligations of the Master Lease, *up to the Sublease Commencement Date*," which was May 15. (Italics added.) Thus, when Andes signed the lease on May 3, it accepted Oceanus's warranty regarding the Master Lease's inclusion of electrical and power fixtures—*in "as is" condition*—up to May 15.

Sublease 2, like the Master Lease, also does not guarantee any particular condition of the premises. It provides:

"6. Condition of Subleased Premises. Subject to the terms of this Sublease 2, upon acceptance of the Subleased Premises from Sublessor 2/Sublessee, Sublessee 2 shall be deemed to have accepted the Subleased Premises in its then 'as-is, where-is' condition. Except as expressly set forth herein, neither Sublessor 2/Sublessee, Sublessor/Lessee nor Landlord has made any guaranties or representations with respect to any part of the California premises. Upon Sublessee's 2 [*sic*] acceptance of the keys to the Subleased Premises, Sublessee 2 shall be deemed to have (a) accepted the Subleased Premises, (b) acknowledged that the same

are in the condition called for hereunder, and (c) agreed that the obligations of Sublessor 2/Sublessee imposed hereunder have been fully performed . . . ."

Thus, neither lease required Oceanus to deliver the electrical and power systems in any particular condition. (See *Del Taco, Inc. v. University Real Estate Partnership V* (2003) 111 Cal.App.4th 16, 26 ["where there is no particular provision in a lease to prepare nonresidential premises for the tenant's use, or to keep them in repair, a landlord is not obligated to do so"].)

Perhaps recognizing this, Andes argues that Oceanus breached the Master Lease by failing to provide any power or electrical systems "at all" and by delivering the premises with "no electrical system." Andes does not support this contention with any citation to the record. Oceanus submitted photos of damage to the electrical and power systems, but all depicted some sort of electrical and power system remaining on the property. That the system was not functioning is undisputed; however, functionality was not warranted.

Even accepting as true that Oceanus delivered the premises without *any* electrical system, the leases provided the property "as is." Sublease 2 warranted that Oceanus fulfilled its obligations under the Master Lease (stating that the leased premises included electrical and power fixtures) only to the commencement date of May 15. Andes does not argue that Sublease 2 commenced on a different date. Andes also appears to concede that the property was delivered afterward—on May 31—when its agent picked up the key.

The record does not establish when the burglary took place. Oceanus declared that the electrical and power systems were in

11

working condition before the lease was signed, and on or about April 14. Andes did not submit evidence to the contrary. It appears that it last inspected the electrical system in March. Andes did not ask for another inspection before it signed the lease on May 3, made its May 30 payment, or before its agent picked up the key on May 31. There is also no evidence that either party was aware of the burglary before May 31. Based on this evidence, the trial court was not compelled to find that Oceanus breached Sublease 2 by failing to deliver electrical and power systems on May 31. (See *Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 1000 [under the substantial evidence standard, a reviewing court must " ' "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor" ' "].)

The leases did not require delivery of the electrical and power systems in anything other than "as is" condition. In addition, Sublease 2 provided that Oceanus satisfied all obligations of the Master Lease up to the sublease commencement date of May 15, and there is no evidence that the burglary occurred before this date. Thus, substantial evidence supports the trial court's determination that Andes has not established the probable validity of its breach of contract claim.

B.   **Andes's right to reject partial delivery and terminate the lease under the quiet enjoyment clause**

The trial court additionally appeared to conclude that Andes failed to establish a necessary element for an attachment order because the evidence indicated Oceanus's cross-complaint had merit—i.e., Andes breached the lease—and Oceanus's damages would offset any potential recovery by Andes. On

12

appeal, Andes asserts that the trial court erred in finding it likely that Andes breached the lease by failing to pay rent. Andes contends it did not accept delivery of the premises and had the right to reject partial delivery and terminate the lease. We conclude that Andes has not established error as to this alternative basis for the trial court's ruling.

The sole case Andes cites regarding acceptance and delivery does not support its position. Andes relies on *Reynolds v. McEwen* (1952) 111 Cal.App.2d 540, 542–543 (*Reynolds*), which states: " 'The duty of the landlord to deliver possession of the demised premises to the tenant, in order to entitle him to the payment of rent, does not extend to the point of requiring actual delivery, and his covenant is satisfied if there is no impediment to the tenant's taking possession or if the tenant is given a legal right of entry and enjoyment during the term.' [Citations.]"

The undisputed evidence offered in the trial court was that once Andes paid June rent and a security deposit, it was entitled to the key. It is also not contested that Andes paid the required amount on May 30, and Oceanus provided Andes's agent with the lockbox code by May 31. Andes appears to concede it had a legal right of entry as of May 31, stating, "Even though tendering [the] key of the leased property may give Andes a legal right of entry, Andes certainly would not be able to enjoy it . . . because of the missing electrical system." Thus, there is substantial evidence that there was no legal impediment to Andes taking possession on May 31 sufficient to excuse its failure to pay rent. (*Reynolds*, *supra*, 111 Cal.App.2d at pp. 542–543.)

*Reynolds* further explains that " 'a lessee cannot relieve himself from liability for rent to accrue under an executed lease for a definite term either by refusing to take possession of the

13

premises or by abandoning the premises after he has taken possession.' [Citation.]" (*Reynolds*, *supra*, 111 Cal.App.2d at p. 543; see *Farmers & Merchants' Nat. Bk. v. Bailie* (1934) 138 Cal.App. 143, 148 ["it is well settled that a tenant may be bound by a covenant to pay rent although he does not enter into the possession of the demised premises"].) In addition, " 'acceptance [of a lease] may be indicated by taking possession *or* paying rent.' " (*Walker v. Dorn* (1966) 240 Cal.App.2d 118, 121, italics added.)

Andes does not distinguish *Reynolds*. Nor does Andes cite any legal authority for the proposition that partial delivery of the premises allowed it to reject delivery, refuse to pay rent, and terminate the lease.

Andes's argument hinges solely on the quiet enjoyment provision in the Master Lease. We find no support for Andes's asserted right to reject delivery in its text. The provision titled "Use of Leased Premises; Quiet Enjoyment" provides: "Subject to the provisions hereof, so long as no Event of Default has occurred and is continuing, Tenant shall quietly hold, occupy and enjoy the Leased Premises throughout the Term, without any hindrance, ejection[,] or molestation by Landlord with respect to matters that arise after the date hereof . . . ." This provision sets forth circumstances when the landlord may enter the leased property.

The quiet enjoyment clause does not state that a tenant may reject delivery and terminate the lease. Andes does not argue otherwise. Moreover, by its terms, the clause applies to disturbances by landlords, not third parties, guaranteeing enjoyment of the premises "without any hindrance, ejection[,] or molestation *by Landlord* with respect to matters that arise after the date hereof." (Italics added.)

14

Additionally, the "Net Lease; Non-Terminability" clause in the Master Lease requires payment of rent "except as provided in Paragraph 18 with respect to the termination."[4]  Andes does not argue that one of the events in Paragraph 18 triggering termination occurred.  Andes asserts that Paragraph 18 does not apply, contending it is applicable only after delivery of the "whole" leased property and possession by the tenant.  Yet, as discussed, Andes does not cite *any* legal authority or contractual provision providing it the right to refuse to accept partial delivery, or otherwise refuse to pay rent and terminate the lease. Andes has not met its burden of establishing trial court error. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 [appellant's burden to

---

[4]     The provision provides:

> "Net Lease; Non-Terminability.
>
> "(a)     This is a net lease and, except as provided in Paragraph 18 with respect to the termination of this Lease as to an Affected Premises,  all Monetary Obligations shall be paid without notice or demand and without set-off, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction[,] or defense (collectively, a 'Set-Off').
>
> [¶] . . . [¶]
>
> "(d)     Except as otherwise expressly provided herein, Tenant shall have no right and hereby waives all rights which it may have under any Law (i) to quit, terminate or surrender this Lease or any of the Leased Premises, or (ii) Set-Off of any Monetary Obligations."

15

provide reasoned argument and citations to relevant legal authority to show error].)

While a "landlord's failure to fulfill an obligation to repair or to replace an essential structure or to provide a necessary service *can result* in a breach of the covenant [of quiet enjoyment] if the failure substantially affects the tenant's beneficial enjoyment of the premises," Andes has made no such argument on appeal. (*Petroleum Collections Inc. v. Swords* (1975) 48 Cal.App.3d 841, 846.) "It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness." (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075.)[5] Andes has therefore failed to meet its burden on appeal to establish trial court error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)

---

[5] We note the evidence did not clearly establish that Oceanus failed to repair the electrical system. On June 6, Oceanus requested time to remedy the situation, stating that it was meeting with electricians to find the fastest way to "solve the electrical issues." Andes filed suit on June 20.

## DISPOSITION

The order is affirmed. Because respondents did not file a brief or otherwise make an appearance, no costs are awarded on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.

17